(No. 72851.—

*In re* KATHERINE ANN PARKER, Petitioner.

*Opinion filed June 9, 1992.*

BILANDIC and HEIPLE, JJ., took no part.

Christine P. Anderson, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Roy O. Gulley, of Heyl, Royster, Voelker & Allen, of Springfield, for petitioner.

JUSTICE CUNNINGHAM delivered the opinion of the court:

Katherine Ann Parker (petitioner) has petitioned this court for reinstatement to the master roll of attorneys licensed to practice law in the State of Illinois. The Hearing Board and the Review Board have recommended reinstatement. The Administrator of the Attorney Registration and Disciplinary Commission (Administrator), pursuant to Supreme Court Rule 753(e)(6) (134 Ill. 2d R. 753(e)(6)), objected to reinstatement and petitioned

this court for leave to file exceptions to the report and recommendation of the Review Board. (134 Ill. 2d R. 753(e)(6).) We granted the Administrator's request and now consider the petition for reinstatement.

Petitioner was admitted to the Illinois bar in 1977 and was disbarred on consent pursuant to Supreme Court Rule 762(a) on September 30, 1986. (107 Ill. 2d R. 762(a).) The disbarment was related to petitioner's Federal conviction in 1986 for conspiracy to distribute marijuana in southern Illinois in the late 1970s and early 1980s.

On April 20, 1990, petitioner filed a petition for reinstatement under Rule 767 (134 Ill. 2d R. 767). The Administrator moved for a continuance, and a hearing was held on December 18, 1990, at which the following evidence was presented.

Petitioner began using marijuana in 1973 when she was a student at MacMurray College. At that time, petitioner was married to David Reid, who also smoked marijuana. The two divorced shortly thereafter, after 2½ years of marriage. Petitioner graduated from MacMurray in 1974 and enrolled in law school at Southern Illinois University that fall. During her three years at law school, petitioner used marijuana with her classmates. Petitioner graduated from law school in 1977, and took a position as a law clerk for United States District Judge Henry Wise in Danville, Illinois.

Petitioner left her employment with Judge Wise at the end of 1977 to move to Carbondale, Illinois, and live with Patrick Baker. Baker worked part-time as a carpenter, but also engaged in the the illegal sale of drugs. Petitioner's use of marijuana increased after she moved in with Baker, and Baker introduced her to cocaine. In 1980, petitioner and Baker married. At this time, petitioner was using cocaine on a daily basis. Petitioner gave birth to her first child in 1981, and her second in 1982.

Petitioner and Baker separated in 1983, and divorced in 1984. Petitioner has custody of the two girls born of this marriage.

During her marriage to Baker, petitioner obtained marijuana and cocaine from him for her personal use. Petitioner also exchanged drugs with friends who were local young professionals. Petitioner and Baker derived their income primarily from the sale of drugs during their marriage, and the two purchased a home from the proceeds of drug sales in 1980.

After the couple's separation, petitioner worked for an attorney, Bill Ballard, in Anna, Illinois. This was a part-time position, on an hourly basis, and ended after a few months.

On November 5, 1983, petitioner applied for a department store credit card and stated on the application that she earned $1,000 a month as an attorney in Ballard's law office, an innaccurate amount. Petitioner also listed her occupation as self-employed for the five years prior to employment at Ballard's office.

Petitioner next worked as an assistant State's Attorney of Union County from December 1983 to December 1984. During this time, petitioner also worked part-time for an attorney in the area. Petitioner admitted using marijuana while employed as an assistant State's Attorney.

On December 18, 1984, petitioner applied for a position with the Illinois Attorney General. On her application, petitioner stated that she made $50 a day at Ballard's office. Petitioner testified that that information was "probably *** innaccurate" because Ballard was having a "rough time" when she worked for him. In December 1984, petitioner secured employment with the Attorney General's office in Springfield, where she served as assistant to the chief of the public aid division. Sometime thereafter, petitioner became aware that she

was under investigation by Federal authorities in the Southern District of Illinois for her previous involvement with illegal drugs. In 1985, petitioner discussed the investigation with her supervisor, who then asked her to leave the Attorney General's office because Neil Hartigan, then Attorney General, was running for election. Petitioner was asked to sign a letter of resignation by her supervisor, who apparently did not want a scandal in the Attorney General's office during the campaign.

Petitioner applied for unemployment compensation on the recommendation of her supervisor at the Attorney General's office, and indicated on the form that she had been laid off. Petitioner was successful in obtaining benefits. Petitioner thereafter left Illinois and moved to Minneapolis to take a position as an executive recruiter.

On January 13, 1986, after cooperating with Federal investigators, petitioner and her attorney appeared in the Federal District Court for the Southern District of Illinois. Petitioner waived indictment and pleaded guilty to the charge of conspiracy to distribute marijuana. At the proceeding, the United States Attorney informed the court that petitioner's involvement in the conspiracy was minimal compared to the amount of drugs involved and to her husband's involvement. At sentencing on March 24, 1986, the United States Attorney noted that petitioner had been cooperative and truthful in the investigation. The court, noting that petitioner's involvement with drugs was mainly for her own personal use, and that she had shown remorse for her activities, sentenced petitioner to five years' probation.

On August 29, 1986, after cooperating with the Attorney Registration and Discipline Commission, petitioner filed a petition asking this court to remove her name from the master roll of attorneys pursuant to Supreme Court Rule 762(a) (107 Ill. 2d R. 762(a)). This

court removed petitioner's name from the master roll of attorneys on September 30, 1986.

After her disbarment, petitioner did not, according to the Administrator, comply with Supreme Court Rule 764. (107 Ill. 2d R. 764.) At the time of petitioner's disbarment, Rule 764 required a disbarred attorney to notify, within 21 days of disbarment, all clients to whom she was responsible for pending matters of the disbarment, and inform them that she could no longer represent them. Rule 764 also required the disbarred attorney to file an affidavit with the supreme court within 35 days of disbarment stating that the notice requirement had been met. Petitioner testified that her attorney at the time handled all her filings, and that she thought he had filed the affidavit. Petitioner had no practice and no clients to notify at the time of her disbarment.

Petitioner left her job as an executive recruiter in Minnesota and applied for employment with Personnel Contractors, Inc., in Minneapolis on July 10, 1986. Petitioner stated in her application for Personnel Contractors, Inc., that the reason she left her job with the Attorney General's office was to move to Minnesota. Petitioner did not inform this company of her conviction and disbarment because it did not ask. Petitioner worked for this company a few months.

Petitioner returned to Illinois in August or September 1986, and found employment that December as the legal services coordinator for the Coalition Against Domestic Violence, a position petitioner held until June 1988. Petitioner informed the two persons who interviewed her for this position, Kathleen Quinn and Donna Ginther, of her conviction and disbarment and indicated her remorse about the incident. Petitioner left this position on friendly terms.

In June 1988, petitioner began working for Tom McGary, an attorney in Springfield. According to peti-

tioner and McGary, petitioner's duties at McGary's office included straightening up the law library, updating his bills, typing, and general office work. Petitioner did not interview or have any direct dealings with clients at McGary's law office. However, petitioner represented to several people that she was a research assistant or paralegal at McGary's office. Petitioner testified that she told people she was a research assistant because she did more than general office work, such as taking care of the law library and updating bills. When petitioner began working at McGary's office, she did not know that the supreme court disfavored disbarred attorneys' working in law offices. However, a few months after becoming aware that such employment might adversely affect her petition for reinstatement, petitioner left McGary's office.

Petitioner soon found employment at the Illinois Citizens Assembly. Petitioner testified that Rick Larison, then chief of staff of the House Republicans of the General Assembly of the State of Illinois, talked to Steve Stalcup, director of the Citizens Assembly, about petitioner, and informed him of her conviction and disbarment. Stalcup, however, disputes this, and testified that to the best of his recollection, he could not remember Larison's informing him of petitioner's conviction and disbarment. Larison did not testify at petitioner's hearing, but according to a stipulation, Larison would have testified that he informed Stalcup of petitioner's conviction and disbarment. Larison also recommended that Stalcup hire petitioner. On cross-examination, Stalcup could not say that Larison was lying about informing him of petitioner's past.

Stalcup interviewed petitioner and offered her a job, which petitioner began on December 5, 1988. According to petitioner's testimony, and that of Stalcup's assistant, Patricia Couch, several days or perhaps a week after pe-

titioner began her job, Couch asked petitioner to complete employment and tax forms. Stalcup disputes this and testified that he required new employees to complete employment forms the first day on the job. Petitioner testified that upon receiving the forms, she noticed that the employment form asked whether she had ever been convicted on an offense other than a traffic or juvenile offense. Petitioner testified that the question made her nervous because she did not want Couch to know of her conviction until she knew her better. Petitioner called Larison and asked to make sure that Stalcup knew of her conviction and disbarment, and Larison assured petitioner that he did. Petitioner also asked Sarunas Valuikenas, former director of the House Republican staff, who introduced petitioner to Larison, about the forms, and Valuikenas told her not to worry because she already had the job and the forms were "no big deal." Petitioner then indicated on the employment form that she had never been convicted of an offense other than a traffic or juvenile offense. Petitioner later informed Couch of her conviction when she knew her better.

On another question on the Illinois Citizens Assembly employment form, petitioner described her previous employment at McGary's office as "legal research; preparation of cases; drafting of legal memoranda [and] court documents. Consultation with lead attorney which required case [and] law analysis." Petitioner also wrote on the form that she had been in charge of a secretary at McGary's office, which was not true. Petitioner testified that she gave these responses because she did not want Couch to know that she performed only clerical work at McGary's law firm. Petitioner was afraid Couch would resent her if she knew petitioner performed only clerical work at McGary's office because petitioner's position with the Illinois Citizens Assembly paid substantially

more than Couch's clerical position. Petitioner wanted it to seem as if she had been previously engaged in legal work to justify the higher salary and position.

On October 7, 1988, petitioner sent a letter to Judge Richard Mills of the Central District of Illinois asking for early release from probation. In her letter, petitioner expressed remorse and shame for what she had done. Petitioner also stated that she experienced a serious addiction to drugs, but that she had nobody to blame but herself. Judge Mills granted petitioner early release from probation in February 1989 on the recommendation of the United States probation office.

In June 1990, petitioner resigned her position from the Illinois Citizens Assembly under favorable conditions, and accepted a position as an assistant to the Lieutenant Governor. A friend of petitioner had informed the Lieutenant Governor and his chief of staff of petitioner's qualifications, as well as her conviction and disbarment. On her application for this job, which petitioner completed after she had been hired, she stated she left the Attorney General's office for personal reasons. Petitioner assisted the Lieutenant Governor in his successful campaign for Secretary of State, and as of the time the briefs in this matter were filed, was employed as deputy director of vehicle services by the Secretary of State.

In addition to presenting evidence of her employment record at the hearing, petitioner presented evidence of her many volunteer efforts since disbarment. Petitioner has: volunteered for her daughter's Brownie activities; provided service to the local domestic violence shelter by painting its walls; served as co-chair, along with the local State's Attorney, of a committee to draft uniform policies for responding to domestic violence cases in Sangamon County; volunteered on an *ad hoc* committee in conjunction with community volunteers and representatives of the Illinois State Bar Association and the Chicago Bar

Association to draft court forms for orders of protection and to amend the domestic violence statutes; and served on the National Training Board of the Victim Services Agency in New York, which provided nationwide law enforcement training, funded by a grant from the Department of Justice. Petitioner also currently serves on the board of directors of the local Rape Information and Counseling Service, has served as that organization's vice-president, and is, along with the United States Attorney, the key fundraiser for that nonprofit organization. During all this time, petitioner has been the custodial parent of her two daughters and has been the primary source of their support.

Petitioner also presented, in the form of character witnesses, evidence of her remorse and rehabilitation. These witnesses included: Kathleen Quinn, formerly executive director of the Illinois Coalition Against Domestic Violence; Madalyn Maxwell, an attorney; Donna Ginther, formerly chair of the Illinois Coalition Against Domestic Violence's legal legislative committee; Patricia Couch; Carol Roberts, wife of Bill Roberts, the United States Attorney for the Central District of Illinois; Sally Kleaveland, executive director of Rape Information and Counseling Services in Springfield; Emily Schirding, assistant to the president at Sangamon State University; Zale Glauberman, public affairs consultant and lobbyist; and James Majors, an attorney with the office of Appellate Prosecutor. The cumulative effect of these witnesses' testimony was that petitioner did not hesitate to make known to them her criminal conviction and remorse, that she was drug-free, and that she was socially accepted as a member of the community.

Finally, petitioner testified that she has kept abreast of the law during her disbarment by: (1) researching domestic and children's issues while at the Illinois Citizens

Assembly; (2) reading advance sheets at McGary's office; and (3) going to a law library periodically.

The Hearing Board released its findings of fact and conclusions of law on March 1, 1991, and unanimously recommended that petitioner be reinstated. In concluding this, the Board found that petitioner's conduct which led to disbarment was not of the type which would prevent her from being reinstated to the roll of attorneys. The Board also found, relying on the character witnesses, that petitioner's conduct during discipline was exemplary, and that nothing about it should prevent her from being reinstated to the roll of attorneys. Concerning the conflicting testimony about petitioner's hiring at the Illinois Citizens Assembly, the Board found Stalcup's testimony vague and unresponsive.

The Administrator filed exceptions to the Hearing Board's findings, and the Review Board, on September 13, 1991, after hearing oral arguments and considering the parties' briefs, unanimously (with one member not participating) upheld and adopted the recommendation of the Hearing Board. The Administrator, pursuant to Supreme Court Rule 753(e)(6), objects to reinstatement and has petitioned this court for leave to file exceptions to the report and recommendations of the Review Board (134 Ill. 2d R. 753(e)(6)). We granted the Administrator's request on November 25, 1991.

We initially note that petitioner, in seeking reinstatement to the practice of law, has the burden of proving by clear and convincing evidence that she should be reinstated. (*In re Carnow* (1986), 114 Ill. 2d 461, 469; *In re Gottlieb* (1985), 109 Ill. 2d 267, 269.) In evaluating a petition for reinstatement, this court must consider the "impact that an attorney's conduct has, or will have, on the legal profession, the public and the administration of justice." (*In re Kuta* (1981), 86 Ill. 2d 154, 157; *In re Zahn* (1980), 82 Ill. 2d 489, 493.) While this court strives

for consistency in attorney discipline and reinstatement cases (*Carnow*, 114 Ill. 2d at 472), we recognize that each case of attorney misconduct and each petition for reinstatement is unique and requires an independent evaluation of its relevant circumstances (*In re Holz* (1988), 125 Ill. 2d 546, 558; *In re Cheronis* (1986), 114 Ill. 2d 527, 535). We further note that this court alone decides whether or not the petition is granted, and thus the hearing panel can only make recommendations as to the disposition of the petition. (*In re Harris* (1982), 93 Ill. 2d 285, 291-92.) However, the hearing panel findings of fact are entitled to virtually the same weight as the findings of any other trier of fact. *Harris*, 93 Ill. 2d at 292.

Supreme Court Rule 767 governs reinstatement of disbarred attorneys and provides the following relevant factors in determining whether a petitioner has been rehabilitated to practice law:

"(1) the nature of the misconduct for which the petitioner was disciplined;

(2) the maturity and experience of the petitioner at the time discipline was imposed;

(3) whether the petitioner recognizes the nature and seriousness of the misconduct;

(4) when applicable, whether petitioner has made restitution;

(5) the petitioner's conduct since discipline was imposed; and

(6) the petitioner's candor and forthrightness in presenting evidence in support of the petition." (134 Ill. 2d Rules 767(f)(1) through (f)(6).)

To be reinstated, petitioner must thus establish that she has been rehabilitated, is presently of good character, and that she is currently knowledgeable as to the law. *Kuta*, 86 Ill. 2d at 158.

Our discussion and analysis begin with the first factor, which concerns the nature of misconduct for which

petitioner was disciplined. (134 Ill. 2d R. 767(f)(1).) The Administrator contends that petitioner's conduct went far beyond the charge for which she was convicted, conspiracy to distribute marijuana, as she was also involved in distributing cocaine. The Administrator also notes that petitioner supplied marijuana and cocaine at parties attended by other attorneys. Additionally, the Administrator argues that petitioner used marijuana while she was an assistant State's Attorney, and such behavior has been considered an aggravating factor by this court. *In re Alexander* (1989), 128 Ill. 2d 524.

Petitioner pleaded guilty on January 13, 1986, to conspiracy to distribute marijuana. The record of that proceeding shows that the United States Attorney and Federal judge noted that petitioner's involvement was basically for her own use, and was minimal compared to that of her husband's. Concerning the nature of the offense, it was not one involving dishonesty or deceit, which brings the legal profession into a particularly bad light. No client's interest was lost here, nor was the trustworthiness of the legal profession brought into question due to petitioner's activities. While petitioner's use of marijuana as an assistant State's Attorney is an aggravating factor, we do not believe that petitioner's involvement with drugs was so serious as to forever bar her from the practice of law, or to prevent her from being reinstated at the present time. (See *In re Alexander* (1989), 128 Ill. 2d 524, 534.) In finding this, however, we in no way condone petitioner's illegal behavior.

The second factor of Rule 767 concerns the maturity and experience of petitioner at the time discipline was imposed. (134 Ill. 2d R. 767(f)(2).) The Administrator argues that at the time of her disbarment, petitioner was 34 years old, had been admitted to practice law for nine years, and had used and sold illicit drugs for over 10 years. Thus, the Administrator concludes, petitioner was

neither immature nor inexperienced. The Administrator also argues that the Hearing Board erred in finding that petitioner's maturity and experience had been clouded by her two marriages.

Petitioner was admitted to the bar of Illinois in 1977, and disbarred on September 30, 1986, some nine years later. We note, however, that the activity which brought about petitioner's discipline occurred several years before discipline was imposed, and, at the time of discipline, the distribution of drugs had long since ceased to be a factor in petitioner's life. Moreover, petitioner's legal experience at the time of the offense was minimal, as she had only served for less than a year as a law clerk. Petitioner also had little legal experience after being involved in the distribution of drugs. Petitioner was employed approximately a year in the State's Attorney's office, after which her involvement with drugs apparently ceased, and nine months in the office of the Attorney General.

We also find, as did the Hearing Board, that petitioner's maturity and experience was clouded by her six-month marriage to David Reid at the age of 19, and her subsequent marriage to Pat Baker, who was involved in the marijuana and cocaine conspiracy. The record reveals that petitioner began using marijuana around the same time she married her first husband, who also used marijuana. The record also reveals that petitioner began to use marijuana heavily, and to use cocaine, when she lived with and married Baker.

The third factor to be considered is whether petitioner recognizes the nature and seriousness of the misconduct. (134 Ill. 2d R. 767(f)(3).) The Administrator argues that while petitioner has expressed regret over her criminal conviction and sorrow over the grief and embarrassment caused to herself and her family, she has failed to express any regret or remorse over the violation of

her professional oath or the embarrassment and damage her misconduct has caused the reputation of the legal profession. The Administrator further argues that petitioner also failed to express any regret or concern over the injury to persons who may have been damaged by her misconduct.

In arguing this, the Administrator attempts to find some aspect to which petitioner has not shown remorse. At the same time, the Administrator implies that petitioner is selfish in that she has shown remorse only for herself and her family. It is apparent, however, from the record and from the fact that petitioner has been drug-free since before her conviction, that she recognizes the nature and seriousness of her misconduct, and has shown remorse for her actions numerous times.

The fourth factor to be considered is whether petitioner has made restitution. (134 Ill. 2d R. 767(f)(4).) The Federal court which convicted petitioner of conspiracy to distribute marijuana found that restitution was not applicable. We find the fourth factor not applicable here.

The fifth factor concerns petitioner's conduct since discipline was imposed. (134 Ill. 2d R. 767(f)(5).) The Administrator alleges here a number of instances of petitioner's alleged improper conduct, including petitioner's: (1) failure to comply with Supreme Court Rule 764 (107 Ill. 2d R. 764); (2) employment in a law office during the period of disbarment; (3) misrepresentation on employment applications; (4) misstatement in judicial proceedings; (5) failure to include debts and assets on probation reports; (6) numerous overdrafts in her checking account; and (7) failure to report all income on tax returns.

The first alleged instance of misconduct is petitioner's failure to comply with Supreme Court Rule 764 (107 Ill. 2d R. 764). While petitioner apparently failed to comply with Rule 764, we note that at the time of her disbarment, she had no practice, and thus no clients to notify.

We also note that petitioner testified that as far as she knew, her attorney had filed the affidavit. Therefore, under the facts of this case, we do not find petitioner's failure to comply with Supreme Court Rule 764 of detriment to her reinstatement.

The Administrator next notes that petitioner worked in a law office during her period of disbarment. The Administrator, relying on *Kuta*, argues that petitioner should not have worked in a law firm as a paralegal during her disbarment. (*Kuta*, 86 Ill. 2d 154.) This court stated in *Kuta* that a disbarred attorney should not work in a law firm as a paralegal or research assistant. (*Kuta*, 86 Ill. 2d at 161.) *Kuta* did not, however, forbid a disbarred attorney from working in a law firm. Moreover, petitioner left McGary's office a few months after she became aware that such work was not favored. While our Rule 764(b) now forbids disbarred attorneys from maintaining a presence in law offices, this rule was adopted in 1989, after petitioner had worked and left McGary's law office. (134 Ill. 2d R. 764(b).) We thus do not find this factor detrimental to petitioner's case.

The Administrator's next contention concerns alleged misrepresentations on petitioner's employment applications. Petitioner's employment application with Personnel Contractors in Minnesota stated that her reason for leaving her previous position was personal. The Administrator argues that this court has found it to be a misrepresentation to indicate the reason for leaving the practice of law was personal when in fact it is because the individual has been disbarred. (*In re Polito* (1989), 132 Ill. 2d 294, 298.) In arguing this, the Administrator confuses the time at which petitioner applied for the job in Minnesota and the time when petitioner was convicted and disbarred. When petitioner left the Attorney General's office, she had not been charged with a crime, not been convicted, and had not been disbarred. Petitioner left the Attorney General's

office for a personal reason: she was under investigation for her past involvement with drugs, was at the time drug-free and raising two children, and did not want to cause a scandal during a campaign.

The Administrator similarly alleges that petitioner inaccurately stated on her employment application to the Lieutenant Governor that she left her position at the Attorney General's office for personal reasons. While petitioner had been convicted and disbarred at this time, she still had not been convicted and disbarred at the time she left the Attorney General's office. Petitioner's subsequent conviction and disbarment do not after-the-fact change her reason for leaving the Attorney General's office. Again, under the facts, this allegation is not significant.

The Administrator next notes that petitioner lied on her application for employment with the Illinois Citizens Assembly in indicating that she had no previous convictions and in describing previous employment at McGary's office as a legal research position. In this instance, the record is clear that petitioner had been hired prior to filling out the job application. And, while the director of the Illinois Citizens Assembly denied that he had knowledge of petitioner's conviction, the Hearing Board found, and the record of these proceedings indicates, otherwise. Thus, it appears that petitioner did not use these misrepresentations to secure a job, but instead, used them only to save her from embarrassment with Couch. While we do not condone petitioner's conduct in this instance, we find, as did the Hearing and Review Boards, that such activity is not sufficient to deny reinstatement.

The Administrator next alleges that petitioner made misstatements in judicial proceedings about her dependency on drugs. When petitioner was being sentenced in Federal court, the court asked her if she had ever been addicted to any narcotic. Petitioner answered that she had not. However, in her 1988 letter to Judge Mills, when she

was seeking a release from probation, petitioner stated she had been addicted to cocaine during her drug-use period, but had overcome this addiction to lead a normal life with her two daughters. Petitioner also admitted at the hearing in the instant matter that she had been addicted to cocaine. However, petitioner clarified that while she was addicted to cocaine, she was not addicted to any narcotic. Cocaine is not a true narcotic. (See *People v. McCarty* (1981), 86 Ill. 2d 247.) Thus, petitioner denied that she had made misstatements because she did not believe cocaine to be a narcotic.

The Administrator's final allegations of misconduct since disbarment concern financial matters and allege that petitioner: (1) failed to disclose a past-due student loan obligation and a past-due bank loan on her probation reports; (2) failed to report that she received financial assistance from a friend on her probation reports; (3) had numerous overdrafts in her checking account; and (4) failed to report all income on her 1985 and 1986 income tax forms. We do not view these omissions and financial transgressions as a determining factor in our decision here.

Concerning the student loan, petitioner testified that her father was the chairman of the board of a bank through which she obtained a student loan. There was an agreement between petitioner and her father that her father would pay off the loan, as he had done with his other children. After law school, petitioner inquired about the loan with the bank, but was told the bank would get in touch with her. Because the bank never contacted petitioner, she thought that her father had paid off the loan. After 10 years, however, the bank informed petitioner that the loan had never been paid. Petitioner then obtained another loan to repay the student loan, and is currently paying off the new loan. Petitioner thus satisfied the delinquent loan once she learned of it, and there is no evidence that petitioner is past due on the new loan.

There is also no evidence that petitioner's bank loan, from Farmer's State Bank of Alto Pass, is past due. Instead, the record shows only that this personal loan with the bank has been renewed, never been defaulted, and is not past due.

Petitioner also admitted at the hearing that a friend of hers had given her money from time to time. Petitioner testified that this friend would have petitioner buy herself a present and then reimburse her for it. This friend also bought things for petitioner's daughters, and paid for an operation on petitioner's dog. Also, some of the money this friend gave petitioner was to reimburse her for money she would lend him when they went out. We do not view this omission from petitioner's probation report as detrimental to her reinstatement.

We finally note here that the other two factors, the overdrafts in petitioner's checking account and the failure to report all income on tax forms, are also not detrimental to petitioner's case. The checks petitioner wrote were all eventually paid, and petitioner has paid the banks the penalties for the overdrafts. The omissions on the tax forms were apparently unintentional omissions on petitioner's part. Petitioner has corrected these omissions, and does not now currently owe any taxes, and is not under investigation by any tax authority for any improper actions.

The sixth factor to consider is petitioner's candor and forthrightness in presenting evidence in support of her petition. (134 Ill. 2d R. 767(f)(6).) The Administrator argues that petitioner omitted required information related to her employment history, financial condition, and income tax records on her petition for reinstatement. However, as did the Hearing Board, we do not find any of these omissions significant, as they would have in no way been harmful to petitioner in her reinstatement proceedings, and were not willful attempts to conceal anything.

First, the Administrator notes that Commission Rule 402(8) required petitioner to provide a statement of all assets and financial obligations during the period of discipline. Petitioner failed to state that she obtained $2,000 from her ex-husband, Patrick Baker, in June 1988. Petitioner testified that she did not list this on her petition because the money was an advance on child-support payments, and she did not consider it a loan. Petitioner also testified that she disclosed this information in her deposition.

The Administrator also argues that petitioner failed to list on her petition the financial assistance she received from her friend. There was no reason given for this omission. Petitioner also failed to list stock which she held and sold in August 1988 for $532.58. However, petitioner did disclose this information in her deposition.

The Administrator also contends that petitioner failed to list the following positions where she practiced law: (1) as a law clerk to Judge Wise; (2) as a part-time employee at Ballard's law office; and (3) as a research associate for Control Corporation in Minnesota in 1986. Petitioner testified that she did not think that the question on the petition asked for the first and third places, as she did not feel she was practicing law there. Petitioner was not questioned as to why she did not include Ballard's office.

The Administrator finally contends that petitioner failed to provide copies of her Federal and State income tax records and petitioner's written consent to secure such copies for the five years preceding the petition's date as required by Commission Rule 402(22). Petitioner's Federal and State tax returns and her written consent to secure such copies are attached to her petition. However, petitioner did not include her 1986 Minnesota income tax return or written consent to secure a copy. Petitioner was not questioned about this omission at the hearing.

We do not view these omissions in petitioner's petition for reinstatement as dishonest or as displaying a lack of candor or intent to deceive. Instead, we view these only as indicators of how the questions on the petition may be interpreted differently, or as innocent oversights on petitioner's part. We also accept the Board's finding that petitioner was very candid and forthright in her testimony.

We thus find no factors under Rule 767 which would indicate that petitioner should not be reinstated. While we believe that several of petitioner's actions were serious, such as the misrepresentations on the Illinois Citizens Assembly employment form, we do not believe that they are of enough magnitude to deny petitioner reinstatement.

The Administrator argues, however, that while petitioner's acts and omissions after disbarment may not be enough to deny reinstatement when viewed separately, when viewed together, those acts and omissions, along with acts prior to disbarment, indicate a penchant for dishonesty. The Administrator notes here the following acts prior to petitioner's disbarment: (1) the false information given on November 5, 1983, to secure a department store credit card; (2) salary information petitioner gave in her application for employment with the Illinois Attorney General's office from her employment at Ballard's law offices; and (3) petitioner's claim on her unemployment form that she had been "laid off" by the Attorney General's office. We disagree with the Administrator, and find that petitioner has proved by clear and convincing evidence that she has rehabilitated herself and is currently fit to practice law.

In concluding such we note that the character witnesses appearing on behalf of petitioner all stated that petitioner had been drug-free, did not hesitate to make known her criminal conviction, and that she was active in community affairs and was accepted in the community. Moreover, the Board observed petitioner during direct ex-

amination, cross-examination and redirect examination and found that she testified with candor and forthrightness as to her past history, events leading up to her conviction, and her struggle to preserve her family during this period of discipline. Thus, the Board found petitioner's explanations concerning the Administrator's various allegations of misconduct to be credible. We also note petitioner's employment history since disbarment, as well as her many volunteer efforts in finding her rehabilitated and fit to practice law. We agree with the Hearing and Review Boards in finding the omissions and various misrepresentations to not be of such magnitude as to preclude petitioner from being reinstated to the master roll of attorneys.

We finally note that the cases relied on by the Administrator in support of his argument concerning petitioner's unfitness to practice law involved facts of a far more serious nature than the instant case. The Administrator cites *In re Polito* (1989), 132 Ill. 2d 294, as an indicator of the honesty which is required before a petitioner may be reinstated. Polito was disbarred on consent after having converted clients' funds on two separate occasions. Polito had been practicing law for over 18 years when he consented to his disbarment. Once disbarred, Polito represented a client until he was confronted in a courthouse by another attorney. Polito then began working for various automobile dealerships, getting fired from several. Polito next applied for a job with the Illinois Department of Public Aid, and made several material misrepresentations on his employment application, including: (1) asserting that he was a self-employed attorney when in fact he no longer had a license to practice law; (2) answering "no" to a question asking whether he had ever been fired from a job; and (3) indicating his last employment was longer than it really was. Later, upon gaining employment with the Illinois Department of Public Aid, Polito submitted false travel

vouchers in order to conceal unauthorized absences from work. Polito also asked for a day off, telling his superior that his daughter was sick, in order to attend a deposition for his reinstatement.

Although the Hearing and Review Boards recommended Polito's reinstatement, this court denied the petition and found that Polito's conduct since disbarment continued to undermine the legal profession, the public, and the administration of justice. Further, Polito had not clearly and convincingly established that he was either rehabilitated and ready to return to the practice of law or an individual of good moral character. In concluding this, this court further noted Polito's behavior prior to disbarment: (1) accepting cash from clients, but failing to report all of the money on his tax forms; (2) hustling clients and bribing sheriffs and clerks for nearly 10 years; (3) failing to report a judge who proposed a fee-splitting arrangement with him; (4) bribing a judge; and (5) failing to comply with Rule 764.

It is thus apparent that the facts in *Polito* were of a much more serious nature than in the instant case. While the facts in *Polito* established a pattern of dishonesty, the same is not true here.

The Administrator also cites several cases in support of the proposition that petitioner's false statements and other misconduct reflect adversely on her character and fitness to practice law. (*In re Mitan* (1979), 75 Ill. 2d 118; *In re Jordan* (1985), 106 Ill. 2d 162; *In re DeBartolo* (1986), 111 Ill. 2d 1.) These cases are also inapposite to the petition at bar. *Mitan* involved an individual who, in his application to the Illinois bar, made nine specific and material misrepresentations, including: (1) failing to disclose four previous addresses; (2) incorrectly stating the year in which he was born; (3) failing to reveal that he legally changed his name; (4) failing to give information concerning a marriage and a subsequent divorce; (5) answering in the negative ques-

tions concerning whether he attended any other law school other than the one from which he graduated and whether he had applied to any other State's bar, when in fact he audited classes at another law school and applied for admission to the Pennsylvania bar; (6) failing to disclose at least five previous employers and occupations; and (7) denying involvement in any prior court proceedings when in fact he had been arrested three times, had pleaded guilty, had been convicted of a felony confidence game, and had been involved in several civil suits. The misrepresentations in *Mitan* revealed a pattern of deliberately misleading information designed to prevent proper investigation into Mitan's past. No such pattern existed here, nor was there even the quantity of misleading information as found in *Mitan*.

*Jordan* is also inapposite. Jordan failed to provide addresses on his bar application, as well as several places of employment, including work in a law office. Jordan also indicated that he had never been accused of dishonesty by an employer, when in fact he had been suspended from the Chicago police department for dishonesty. Jordan also stated on his application that he had been discharged by the Chicago police department for failing to obey a direct order. The reason for dismissal, not given on the application, was that Jordan, while off duty, pointed a gun at the head of a man, and without justification, struck and beat the man. The direct order Jordan refused was to submit to a breathalyzer test after this incident. Jordan also failed to disclose: (1) a prior arrest; (2) 297 parking tickets issued to him; (3) other discipline he received while employed by the Chicago police department; and (4) that after he filed his bar application, he was a party to a bankruptcy. On the whole, Jordan misrepresented a number of facts in an effort to avoid questions about his character upon applying to the bar. This situation is not present here.

*DeBartolo*, too, is inapplicable. *DeBartolo* involved an applicant to the bar who had accumulated 200 to 400 parking tickets during a short time period and had at several times falsely represented himself as a police officer, going so far as to ask a police officer if he could borrow his gun and badge to arrest some people. DeBartolo also listed the wrong high school he attended on his application, as well as the wrong years he attended high school, and failed to list five previous addresses. We concluded in *DeBartolo* that the applicant did not possess the good moral character and general fitness necessary for the practice of law, as his omissions demonstrated a lack of concern for the truth, and frustrated the Committee on Character and Fitness in its investigation of DeBartolo. Moreover, DeBartolo had shown disregard for the law by accumulating between 200 and 400 parking tickets in a short time, and by misrepresenting himself as a police officer. The facts in *DeBartolo* thus were more serious than in the instant case.

Although petitioner has made errors on her path to reinstatement, we cannot say the errors were of such significance that her petition should be denied, when viewed in light of the positive aspects of her rehabilitation.

For the aforementioned reasons, the petition for reinstatement is granted, and petitioner is to be reinstated to the practice of law and her name added to the master roll.

*Petitioner reinstated.*

JUSTICES BILANDIC and HEIPLE took no part in the consideration or decision of this case.